**WIL–KIL PEST CONTROL COMPANY, a Division of Copesan Services, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 18402.

United States Court of Appeals, Seventh Circuit.

March 4, 1971.

James A. Urdan and Harold P. Southerland, Quarles, Herriott, Clemons, Teschner & Noelke, Milwaukee, Wis., attys., for petitioner.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Julius Rosenbaum, Attys., N. L. R. B., for respondent.

Before DUFFY, Senior Circuit Judge, FAIRCHILD, Circuit Judge and GRANT, District Judge.[1]

DUFFY, Senior Circuit Judge.

In this case, Wil-Kil Pest Control Company, a division of Copesan Services, Inc., (hereinafter Company), petitioned to review and set aside an order of the National Labor Relations Board (Board), and the Board filed a cross-petition for enforcement of its order. The Board's decision and order were issued on March 23, 1970, and are reported at 181 N.L.R.B. No. 119.

The alleged unfair labor practices occurred at Milwaukee, Wisconsin, where the Company is engaged in the sale of pest and termite control services.

The principal facility of the Company is located at Milwaukee. Additional facilities are located in Racine, Madison and Appleton, Wisconsin, which are, respectively, 15, 80 and 100 miles distant from Milwaukee. These four facilities

---

1. District Judge Grant sitting by designation.

service Wisconsin and northern Michigan. Each facility has its own regular complement of permanently assigned employees. Temporary assignments of employees to other offices are rare.

There are twelve servicemen and two warehousemen employed in the Milwaukee facility. In the same classifications there are three employees at Racine, six at Madison and five at Appleton. Servicemen check in once each week at their assigned facility, receive their assignments and report on their previous week's activities. Each facility schedules its own work, solicits its own business and recruits its own employees from the locality to which they will be assigned.

Werner Schmidt is in charge of all operations. Schmidt describes his activities as "more of a management function" having to do with advertising, publishing, inventory and policy than a direct supervisory function.

The Milwaukee branch employees are directly supervised by Manager Glassow and supervisors Leverenz and Gottchalk. The employees at Racine, Madison and Appleton are supervised by respective branch managers and by a special training supervisor, John Quale, who divides his time among those three branches.

The branch manager interviews and screens applicants for hire. General Manager Schmidt has complete authority in the hiring and discharging of employees, but admittedly gives great weight to the recommendations of the branch managers. With respect to firing, Schmidt testified that he had not participated in any "actual firing in the last year and a half."

The Milwaukee office maintains purchasing records and all payroll records. Personnel policies usually are determined by the Board of Directors and by General Manager Schmidt. Each office prepares its own vacation schedules.

In 1961, a petition for an election was filed by another affiliate of the same International Union as is here concerned. The petition sought a unit limited to the Milwaukee facility. After a hearing, the parties stipulated to a unit including the other three locations. An election was ordered, but two days before the scheduled date, the petition was withdrawn.

In 1963, a similar petition was filed by a different local union seeking a unit of servicemen at the Milwaukee location of the Company. However, the parties stipulated for an election in a unit including all four locations. A majority of the ballots was against the petitioning union.

Early in February 1969, the Company's servicemen in the Milwaukee plant began to complain about their wages and benefits. They were urged to make their complaints known to the Company in the form of specific written demands. Led by employee Jacobs, the employees made such written complaint. The employees were then told by a Company supervisor: "Don't rock the boat. * * * You guys got your cars and things like this. * * * You got a lot of benefits and you don't want to lose any of them." Similarly, a little later in negotiations, they were told by a Company representative: "You've got to be real careful. They will pull the cars in." Finally, the employees, led by employee Jacobs, sought union recognition. The required union authorization cards were obtained, and on April 2, 1969, the union filed a petition for representation seeking a unit limited to the employees of the Milwaukee plant.

On April 8, employee Jacobs was summoned to General Manager Schmidt's office and interrogated as to why the employees had gone to the union. Schmidt also stated that he "figured that * * * (the employees) made the wrong move." Schmidt disavowed making any threats regarding the use of cars.

The Regional Director issued his Decision and Direction of Elections on May 2, 1969. On the basis of the evidence received at the Pre-election hearing, he held that an appropriate bargaining unit within the meaning of Section 9(b) of

the Act included all servicemen and warehousemen at the Company's Milwaukee facility. The Board denied the Company's request for a review of the Director's Decision.

An election was held in the Milwaukee unit. The union won by a vote of 8 to 6. The Director certified the union as the bargaining representative of the Milwaukee unit employees.

The union orally requested Schmidt to commence contract negotiations. Schmidt replied by letter that the Company had decided "to seek a court review of the N L R B's decision which segmented the Milwaukee office * * * for collective bargaining purposes." The Company declined the union's request to bargain for a unit limited to the Milwaukee employees.

The Company first refused to recognize and bargain with the certified union on July 15. On the same day, the Company promulgated written rules relating to the use of Company vehicles. This was done without first notifying or discussing the matter with the union.

One of the new Company rules read: "Any employee living outside of Milwaukee County and not within his route shall return the car to the parking lot each night and pick it up every morning."

A copy of the new rules over the signature of Manager Schmidt was mailed to each of the eleven servicemen at the Milwaukee facility. Nine of these servicemen have regular routes where they service their respective routes on a monthly basis. The other two so-called Special men do not have specific territory to service, but they report each day at the office to receive their daily assignments.

For a period of at least seven years, it was the practice of the Company that regular servicemen, after completing their rounds, could, at no extra cost to themselves, drive the Company car to their homes and, the following morning, drive directly to their routes to service their customers.

At the time the new rules were promulgated, employee Jacobs lived in the territory he serviced in Milwaukee County. However, he was, at that time, building a home in Grafton, Ozaukee County, which was outside of his route. Jacobs had discussed this matter on several occasions with Schmidt prior to July 15.

Jacobs moved out of Milwaukee County to his newly constructed home in Grafton. Thereafter, Jacobs was required to park his assigned car on the Company parking lot at night and pick it up on the following morning in order to service his customers.[2]

The Board found, in agreement with the trial examiner that the Company violated Section 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the Union as the certified representative of its employees in an appropriate unit and by unilaterally instituting changes and conditions of employment.

The Board also found the Company violated Section 8(a) (3) and (1) of the Act by depriving Jacobs, because of his union leadership, of a long-standing privilege enjoyed previously of using his assigned Company vehicle to drive to and from his home at no cost to him.

The Board further found that the Company violated Section 8(a) (1) of the Act by coercively interrogating employee Jacobs concerning the employees' union interest and activities.

■ The Company's primary contention is that the Board's determination of the Milwaukee facility as an appropriate bargaining unit was incorrect. Our review of the Board's action in this area is limited. As the United States Supreme Court has stated: "The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of ne-

---

2. Enforcement of the published rules has been held in abeyance pending decision in the instant proceeding.

cessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed." Packard Motor Car Company v. N. L. R. B., 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040.

Similarly, this Court has recognized that the Board has wide discretion in determining the appropriate bargaining unit. State Farm Mutual Automobile Insurance Co. v. N. L. R. B., 411 F.2d 356 (en banc); N. L. R. B. v. Winnebago Television Corp., 440 F.2d 369 (1971), and that unless the Board's action is "arbitrary and capricious" we must accept its decision. International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, C. I. O. v. N. L. R. B., 231 F.2d 237.

In making its determination, the Board is not required to choose the most appropriate unit but only to choose *an* appropriate unit within the range of several appropriate units in a given factual situation. And, in so deciding, such factors as: "the company organization, the numerical size of the unit, the geographical distribution of the employees in the unit, the responsibilities of the unit supervisor, the type of work done by the employees in the unit, the responsibilities of the unit supervisor, the organizability of the unit, and the extent to which the unit has already been organized, are all relevant considerations and no one factor is determinative." State Farm Mutual Automobile Insurance Co. v. N. L. R. B., *supra*, 411 F.2d page 358. Furthermore, the lack of substantial interchange with employees outside the unit is a factor which significantly supports the propriety of a limited unit. N. L. R. B. v. Lou De Young's Market Basket Inc., 406 F.2d 17 (6 Cir., 1969).

Applying the foregoing criteria to the present case, we hold that the Board did not abuse its discretion in finding that the servicemen and warehousemen of the Milwaukee facility constituted an appropriate unit for collective bargaining purposes. The employees of the Milwaukee facility tend to remain intact due to the minimal amount of employee transfer and interchange with other areas where the Company operates. The Milwaukee plant is separated from the other three facilities by significant geographical distances. While there is some centralization of control for all four plants, there also is a significant amount of local autonomy among the plants in terms of supervision, business, solicitation, recruiting and hiring.

We further hold that since the union was entitled to recognition, the Company could not make unilateral changes with respect to mandatory collective bargaining subjects without giving the union notice and an opportunity to bargain. N. L. R. B. v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L. Ed.2d 230. The Company's promulgation of rules concerning the use of Company cars thus violated Section 8(a) (5) and (1) of the Act.

We further hold that substantial evidence as a whole supports the Board's finding that the Company violated Section 8(a) (3) and (1) of the Act by depriving employee Jacobs of a long-standing privilege regarding the use of his Company car and that this action was taken because of Jacobs' union activities.

We agree with the Board that the timing and precipitant nature of the change of a long-standing practice, coming as it did without prior warning and on the same day as the Company's first refusal to bargain, and on the heels of Jacobs' union activities, are strong evidence of unlawful motivation. See N. L. R. B. v. L. E. Farrell Co., 360 F.2d 205, 208 (2 Cir., 1966).

We also hold that substantial evidence on the record as a whole supports the finding of the Board, that the Company violated Section 8(a) (1) of the Act by coercively interrogating employee Jacobs on April 8 concerning his union sympathies and activities. While the content of the April 8 conversation taken by itself might not support such a finding, when viewed in the context of

the Company's other inquiries as to the union sentiments of its employees, its refusal to recognize and bargain with the certified representatives of the employees and the unilateral changing of the rules as to the Company's motor vehicles, we think there is substantial evidence to support a finding of unlawful coercion which is proscribed by Section 8(a) (1) of the Act. N. L. R. B. v. Henry Colder Co., 416 F.2d 750, 753 (7 Cir., 1969).

We hold that judgment should issue denying the Company's petition for review and that the order of the Board be

Enforced.