**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CHICAGO HEALTH & TENNIS CLUBS, INC., Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SAXON PAINT & HOME CARE CENTERS, INC., Respondent.**

Nos. 77–1227, 77–1504.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1977.

Decided Dec. 2, 1977.

Rehearing and Rehearing In Banc Denied in No. 77–1227 Jan. 6, 1978.

Elliott Moore, Deputy Associate Gen. Counsel, Jay E. Shanklin, Anne H. Andrews, Harvey M. Stone, Attys., N. L. R. B., Washington, D. C., for petitioner.

Michael L. Sklar, Anthony E. Dombrow, Chicago, Ill., for respondents.

Before SWYGERT and BAUER, Circuit Judges, and CAMPBELL, Senior District Judge.[1]

SWYGERT, Circuit Judge.

In the two cases before us, the National Labor Relations Board ("the Board") petitions for enforcement of its orders directing each of the respondents to cease and desist from refusing to bargain collectively with the union which had been certified as the exclusive bargaining representative.[2] These two cases have been consolidated for this opinion because they present the identical legal issue: whether the Board abused its discretion in certifying a single retail store as an appropriate unit for collective bargaining where such store constitutes only one of a chain of stores owned and operated by the company in the Chicago metropolitan area. For the reasons set forth, we grant the petition in *Chicago Health Clubs* and deny enforcement in *Saxon Paint*.

I

(A) *Parties*

No. 77–1227. Chicago Health & Tennis Clubs is an Illinois corporation engaged in the sale of club memberships and providing services of exercise training and weight loss counseling for its members. It operates sixteen clubs in the Chicago metropolitan area (Chicago and suburbs). Its central

---

1. The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

2. This court's jurisdiction is based on section 10(e) of the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq.*

office is located in Chicago's central business district and all clubs are within a 28-mile radius of this office.

No. 77–1504. Saxon Paint & Home Care Centers is an Illinois corporation engaged in the retail sale of paint, wallpaper, and home decorating supplies. It owns and operates twenty-one stores in the Chicago metropolitan area (Cook County). In addition, Saxon has seven other stores in Illinois, Indiana, and Wisconsin. Although these seven stores are operated by separate corporate entities, they are owned in part by the same stockholders and are operated through a single managerial hierarchy. All of the Chicago metropolitan area stores are within a 30-mile radius of each other.

### (B) Procedural History

The procedural history of the two cases is similar and therefore a single description suffices. The proceeding began when the Retail Clerks Union, Retail Clerks International Association, AFL–CIO–CLC [3] filed a petition for representation seeking a unit limited to the employees of a single store in the company's chain. The company opposed the petition, contending that the only appropriate unit could consist of all its employees working in all its chain stores in the Chicago metropolitan area. Following a hearing, the Regional Director found that a single store constituted an appropriate bargaining unit. The Board denied the company's request for a review of the Director's decision.[4]

An election was held in which a majority of the employees designated the Retail Clerks Union as their collective bargaining agent. The Director certified the union as the exclusive bargaining representative and shortly thereafter the union requested the company to bargain. The company refused on the ground that the unit found by the Board was inappropriate. The union then filed an unfair labor practice charge, alleging an unlawful refusal to bargain. Complaints issued and in its answer the company admitted its refusal to bargain, reasserting the inappropriateness of the designated unit.

The Board granted the General Counsel's motion for summary judgment,[5] finding that each company violated section 8(a)(1) and (a)(5) of the Act by refusing to recognize and bargain with the union.[6] On these two petitions for enforcement, each company reasserts its challenge to the unit determination. Since the companies defend solely on the grounds that the unit determinations were inappropriate, and since they concede that they refused to bargain, it is undisputed that the companies violated section 8(a)(1) and (a)(5) of the Act if the Board's unit determinations were correct. See NLRB v. Frisch's Big Boy Ill-Mar, Inc., 356 F.2d 895, 897 (7th Cir. 1966).

## II

■ The primary responsibility for determining the appropriateness of a unit for collective bargaining rests with the Board. It is given broad discretion in determining bargaining units "to assure to employees the fullest freedom in exercising the rights guaranteed by [the Act]." 29 U.S.C. § 159(b). The Board is not required to select the most appropriate bargaining unit in a given factual situation; it need choose only an appropriate unit within the range of appropriate units. Wil-Kil Pest Control

---

3. Although the same union was involved in each case, Saxon involved Local 1504, and Chicago Health Clubs involved Local 1540.

4. In Saxon, one of the three board members, Peter D. Walther, dissented without opinion.

5. See Saxon Paint & Home Care Centers, Inc., 228 N.L.R.B. No. 15 (Feb. 8, 1977); Chicago Health & Tennis Clubs, Inc., 226 N.L.R.B. No. 178 (Nov. 29, 1976). Board member Peter D. Walther dissented in both cases.

6. Section 8(a) of the Act (29 U.S.C. § 158(a)) provides in relevant part:

(a) It shall be unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this title;

\*   \*   \*   \*   \*   \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) of this title.

*Co. v. NLRB,* 440 F.2d 371, 375 (7th Cir. 1971). It follows that Board unit determinations are rarely to be disturbed. *South Prairie Construction Co. v. Local No. 627, International Union,* 425 U.S. 800, 805, 96 S.Ct. 842, 48 L.Ed.2d 382 (1976); *Packard Motor Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed.2d 1040 (1947).

■ Although Board determinations are subject to limited review, they are not immune from judicial scrutiny. We must bear in mind that section 10(e) of the Act clothes the courts of appeals with authority to enter decrees "enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. § 160(e). Indeed, the Supreme Court has held that we are not " 'to stand aside and rubber-stamp' Board determinations that run contrary to the language or tenor of the Act." *NLRB v. Weingarten, Inc.,* 420 U.S. 251, 256, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975); *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Accordingly, we have the responsibility of determining whether the Board's unit determinations were unreasonable, *NLRB v. Krieger-Ragsdale & Co.,* 379 F.2d 517, 521 (7th Cir. 1967), *cert. denied,* 389 U.S. 1041, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968), arbitrarily or capriciously made, *State Farm Mutual Automobile Insurance Co. v. NLRB,* 411 F.2d 356, 358 (7th Cir.) *(en banc), cert. denied,* 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969), or unsupported by substantial evidence, *NLRB v. Pinkerton's Inc.,* 416 F.2d 627, 630 (7th Cir. 1969).

■ In making unit determinations, the Board must effect the policy of the Act to assure employees the fullest freedom in exercising their rights, yet at the same time "respect the interest of an integrated multiunit employer in maintaining enterprise-

wide labor relations." *NLRB v. Solis Theatre Corp.,* 403 F.2d 381, 382 (2d Cir. 1968). *See Szabo Food Services, Inc. v. NLRB,* 550 F.2d 705, 709 (2d Cir. 1976); *NLRB v. Pinkerton's Inc.,* 428 F.2d 479, 485 (6th Cir. 1970). In reaching its decision, the Board considers several criteria, no single factor alone being determinative. *State Farm Mutual,* 411 F.2d at 358. These factors include:

(a) geographic proximity of the stores in relation to each other, *NLRB v. Kostel Corp.,* 440 F.2d 347 (7th Cir. 1971); *Wil-Kil Pest Control Co. v. NLRB,* 440 F.2d 371 (7th Cir. 1971);

(b) history of collective bargaining or unionization, *Kostel Corp., supra; State Farm Mutual, supra;*

(c) extent of employee interchange between various stores, *Walgreen Co. v. NLRB,* 564 F.2d 751 (7th Cir. 1977); *NLRB v. Pinkerton's Inc.,* 416 F.2d 627 (7th Cir. 1969);

(d) functional integration of operations, *State Farm Mutual, supra; NLRB v. Frisch's Big Boy Ill-Mar, Inc.,* 356 F.2d 895 (7th Cir. 1966); and

(e) centralization of management, particularly in regard to central control of personnel and labor relations. *Walgreen Co., supra; Wil-Kil Pest Control, supra; Frisch's Big Boy, supra.*

As the geographic proximity of the stores in the two cases before us is almost identical, our decision whether to grant the petitions for enforcement must rest on an analysis of the other factors.

■ One further item deserves note before proceeding to a discussion of the individual cases. Although the Board has vascillated in deciding the proper scope of a bargaining unit in the retail chain industry,[7] it has apparently now adopted the

---

7. The Board's unit determinations in regard to multistore retail operations has fluctuated from one extreme to another. Before enactment of the Taft-Hartley Act in 1947, the Board regularly approved single retail chainstore bargaining units. *See, e. g., Koppers Stores,* 73 N.L.R.B. 504 (1947). Sometime after the Taft-Hartley Act, however, the Board developed a virtual

presumption against the appropriateness of single-store units. For example, in *Safeway Stores, Inc.,* 96 N.L.R.B. 998, 1000 (1951), the Board stated:

[A]bsent unusual circumstances, the appropriate collective bargaining unit in the retail . . . trade should embrace all employees within the categories sought who perform

administrative policy that a single store is "presumptively an appropriate unit for bargaining." *Haag Drug Corp.*, 169 N.L.R.B. 877–78 (1968).[8] That presumption, however, is not conclusive and "may be overcome where factors are present in a particular case which would counter the appropriateness of a single store unit. . . . " *Id.* at 878.

We turn now to the two cases before us.

## (A) *Saxon Paint, No. 77–1504*

Although the Board recognized that the Chicago area Saxon stores exhibited "a high degree of centralized administration," it nevertheless found a single store unit appropriate. In large part, the Board based its unit determination on the role of the local store manager, adopting the Regional Director's finding that "substantial responsibility is invested in the Employer's store managers." We believe that the Board exaggerated the control exercised by the store manager over labor and administrative matters and hold that the Board's finding that the store manager possesses autonomy and authority is not supported by substantial evidence.

The evidence in the record clearly establishes that Saxon is a highly integrated operation. Each Saxon store is similar in all respects to each of the other Saxon stores in Cook County. All of the stores are open on the same days and at the same times. They sell the same merchandise at the same price and the physical layout of each store is similar. Special sales and promotions are held at the same time in each store with the same sale prices being charged. Advertising covers the entire metropolitan area and is prepared by headquarters as are store signs and window displays. The stores are "as much alike in this respect as peas in a pod." *NLRB v. Frisch's Big Boy Ill-Mar, Inc.*, 356 F.2d 895, 896 (7th Cir. 1966).

Personnel and labor relations policies for the Saxon stores are also centrally administered, being formulated by the personnel director who maintains his office at corporate headquarters. Payrolls, accounts, personnel files, and other records are maintained at the general office. Employee job classifications are the same at each store, and employees within a particular classification perform the same duties and are required to have the same skills and experience. Employees within the same classification, experience, and seniority receive the same wages. A uniform fringe benefit program is maintained at each store, and store employees enjoy company-wide seniority.

The actual operations of the Cook County stores are also highly centralized. Under the vice president of operations are three district managers who are responsible for

---

their work within the Employer's administrative division or [geographic] area.

*See also Weis Markets, Inc.*, 142 N.L.R.B. 708, 710 (1963); *Daw Drug Co.*, 127 N.L.R.B. 1316 (1960); *Crown Drug Co.*, 108 N.L.R.B. 1126 (1954).

The presumption encompassing all retail stores within a geographic or administrative area was discarded in 1962 when the Board announced that thereafter it would "apply to retail chain operations the same unit policy which we apply to multiplant enterprises in general." *Sav-On Drugs, Inc.*, 138 N.L.R.B. 1032, 1033 (1962). Two years later, in a complete reversal of its policy articulated in *Safeway*, the Board held that the single unit is "presumptively appropriate unless it be established that the single plant has been effectively merged into a more comprehensive unit so as to have lost its individual identity." *Frisch's Big Boy Ill-Mar, Inc.*, 147 N.L.R.B. 551 n.1 (1964), *enforcement denied*, 356 F.2d 895 (7th

Cir. 1966). *See Haag Drug Co.*, 169 N.L.R.B. 877 (1968).

8. Several Board decisions since 1968 suggest, however, a weakening of the presumptive appropriateness of single store units. *See, e. g., Kirlin's Inc. of Central Illinois*, 227 N.L.R.B. No. 174 (1977); *Twenty-First Century Restaurant Corp.*, 192 N.L.R.B. 881 (1971); *Waiakamilo Corp. d/b/a McDonald's*, 192 N.L.R.B. 878 (1971); *The Pep Boys—Manny, Moe & Jack*, 172 N.L.R.B. 246 (1968). Some decisions seem impossible to reconcile. For example, in two cases decided within two months of each other, the Board came down with completely different results even though both cases arose from the same geographic area and both cases involved retail drugstore chains having highly centralized operations. *Compare Walgreen Co.*, 198 N.L.R.B. 1138 (Aug. 30, 1972) (single store appropriate), *with Gray Drug Stores, Inc.*, 197 N.L.R.B. 924 (June 26, 1972) (single store inappropriate).

assuring that all stores within their respective districts are being operated in full compliance with the policies and procedures formulated at headquarters, including personnel and labor relations policies. These district managers visit the stores within their district on the average of every two days and maintain further contact with the individual stores through frequent telephone calls and written memoranda. In addition, the company maintains a messenger service which visits each metropolitan area store daily.

At the store level and below the district managers, the company employs fourteen store managers in all three districts. Seven of these managers are assigned to single stores, the remaining seven managers are each assigned to two stores. The evidence establishes that, contrary to the Board's conclusion, these store managers have limited involvement in the store's non-labor business activities. The individual store managers have no authority to commit the employer's credit, purchase or order merchandise and supplies, arrange for repair or maintenance work, change prices, or resolve customer complaints. At best it can be said that it is the responsibility of the store managers to implement the company's policies and procedures within the individual stores.

The store managers' involvement in labor relations and personnel matters is also severely limited. They have no authority to do any of the following: (a) hire new employees; (b) grant promotions, wage increases or changes in job classifications; (c) discharge or suspend employees for disciplinary reasons; (d) lay-off employees; (e) handle employee grievances; (f) grant requests for vacations or leaves of absence; (g) permanently or temporarily transfer employees between any of the stores; and (h) post the weekly work schedule without prior approval by the district manager. While the store manager may offer recommendations in certain of these areas, the record shows that these recommendations, even in such key areas as employee discharge, may not be followed. Furthermore, in certain areas such as promotion and wage increases, the store manager may not even be consulted before a decision is made. As the Second Circuit noted in *NLRB v. Solis Theatre Corp.,* 403 F.2d 381, 383 (2d Cir. 1968):

> It appears, therefore, that instead of being in a decision making position, the "manager" has little or no authority on labor policy but is subject to detailed instructions from the central office.

That Saxon is completely integrated functionally is best illustrated by its hiring and training practices. Hiring is done almost exclusively through the corporate offices. Job applications are taken and interviews are held at the personnel office.[9] The store manager may interview an applicant only after the applicant has first interviewed with the personnel director and then the district manager. Applicants may be rejected and new employees hired, however, without prior consultation with or participation by the store manager.

Similarly, the training of new employees comes under the primary jurisdiction of the central personnel department. The company issues manuals to all new employees and provides them with formal training, lasting from one to two weeks, at its corporate headquarters. In sum, it is apparent that there is no local autonomy among the individual stores and that the store managers lack the authority to resolve issues which would be subject to collective bargaining. *See Frisch's Big Boy,* 356 F.2d at 897.

■ That Saxon's business is both centralized and integrated and that the individual stores lack meaningful identity as a self-contained unit is further supported by the numbers of employee transfers, both temporary and permanent, among the metropolitan area stores. During a thirteen month period and discounting employees

---

**9.** Applications may be taken at the individual stores, but this is the exception rather than the rule. Moreover, even though the store manager may conduct a preliminary interview in such cases, the applicant must still be screened and interviewed at headquarters.

not covered in the unit,[10] eighteen percent of all employees were transferred permanently among the Chicago stores. Additional testimony showed that temporary transfers frequently occur, almost on a daily basis.[11] While this alone may be insufficient to negate a single store unit, we cannot agree with the Board's finding that "the degree of employee interchange [was] too inconsequential and insubstantial to rebut the appropriateness of a single store unit," particularly when this factor is considered in light of all of the other factors.

That a single store is inappropriate here is further shown by the history of collective bargaining. The pattern of unionization both at stores in other regions and at stores within the Chicago metropolitan area has always been district wide. Since 1966, the employees at the company's two Hammond, Indiana stores have been represented by another local of the Retail Clerks Union. These employees are covered by one collective bargaining agreement between the union and the company. Both present and past agreements have stated that the unit it covers is "all present and future retail establishments of the Company situated within the Gary, Indiana metropolitan area, including the County of Lake." A similar clause was contained in the agreement with the employees from the company's store in Rockford, Illinois.[12]

The record also reveals that the Retail Clerks Union once petitioned the Board for a representation election among all of the company's Chicago metropolitan area stores. An election was conducted in 1965 among the then existing five Saxon stores. A second election, held in 1967, also included a sixth Saxon store which was opened during the intervening period of time.[13] We agree that this bargaining history is not controlling because the elections were conducted pursuant to an agreement between the union and the company. But we cannot agree that this history is entitled to little or no weight for, at a minimum, it shows that the union previously considered and treated all of the company's stores in the Chicago metropolitan area as a single unit.

The Board argues that the instant case is controlled by this court's recent decision in *Walgreen Co. v. NLRB,* 564 F.2d 751 (7th Cir. 1977), which held that a single store in a chain of drug stores within the Chicago metropolitan area was an appropriate unit. We are not persuaded the Board's order should be enforced on the basis of *Walgreen* for it is distinguishable both in the absence of bargaining history and in the amount of autonomy exercised by the store manager. In *Walgreen,* the district managers supervised a larger number of stores and visited each store far less frequently than in the

10. Primarily excluded were store managers. Including store managers, over twenty-five percent of all employees were permanently transferred during the thirteen-month period.

11. The Regional Director refused to consider the temporary transfers because the company did not come forward with specific data on the frequency of such transfers. The uncontradicted testimony was that, because of the proximity of the stores and because the jobs in the different stores are identical, temporary transfers occur almost daily. The company explained the lack of more specific evidence as follows:

> [There are] so many of them [temporary transfers]. We would not have really any place to store the amount of paper work that would be required to keep track of those [temporary transfers].

We believe that while the Regional Director could have discounted the weight of the testimony because of its lack of specificity, it could not completely ignore such testimony when it stood unrefuted.

12. Prior to the union's decertification in 1975, the employees at the Rockford store were covered by a collective bargaining agreement which described the covered unit as "all present and future retail establishments of the Employer situated within the Rockford, Illinois metropolitan area, including the counties of Winnebago, Boone, Stephenson & Joe Daviess." While the company had only one store in that geographic area at that time, it is noteworthy that the union wanted to represent all of the company's employees within the metropolitan area.

13. Employees from the Oak Lawn store, the store in question in this case, did not participate in these elections as the store had not opened at the time.

case at bar.[14] Furthermore, most of the personnel and labor related decisions such as hiring, firing, and promotions "were based on" the recommendations of the store manager. Thus the court found that much of the employment activities were supervised directly by the local store manager "without significant interference" by the central organization. We cannot say, with the particular facts before us, that the local store manager here operates "without significant interference" by the central office.[15]

The factual situation involved in this case is rather more analogous to that found in *NLRB v. Frisch's Big Boy Ill-Mar, Inc.,* 356 F.2d 895 (7th Cir. 1966). In *Frisch's,* this court refused to enforce a Board order finding a single store unit appropriate among ten restaurants in Indianapolis, Indiana. After reviewing the record, we found that the restaurants were a single, integrated enterprise and that each restaurant lacked sufficient autonomy, even though the individual restaurant manager could order supplies and merchandise and could independently hire employees within centrally prescribed wage rates. In finding a single store unit inappropriate, this court said:

> It is evident to us that the decisions left to the managers do not involve any significant elements of judgment as to employment relations.
>
> \*    \*    \*    \*    \*    \*
>
> It is obvious to us that none of the store managers will be deciding questions affecting the employees in the context of collective bargaining. 356 F.2d at 897.

**14.** In *Walgreen,* eight district managers supervised 124 stores, a ratio of 1 to 15.5. This compares to the ratio of one to seven in this case. Furthermore, in *Walgreen,* the district managers visited each store from once every ten days to once every three and one-half weeks, as opposed to once every two days in the instant case.

**15.** The other cases from this circuit which have enforced the Board's order finding single store units appropriate are also distinguished by the degree of autonomy exercised by the local store manager. *See, e. g., Wil-Kil Pest Control Co. v. NLRB,* 440 F.2d 371 (7th Cir. 1971); *NLRB v. Kostel Corp.,* 440 F.2d 347 (7th Cir. 1971);

It would be an anomaly indeed to find a single store appropriate here when the store managers in this case have considerably less autonomy than the store managers in *Frisch's.*

■ For the reasons herein stated, we conclude that the Board's determination that a single Saxon store was an appropriate bargaining unit is not supported by substantial evidence and therefore is arbitrary and unreasonable. Accordingly, the Board's order is set aside and enforcement is denied.

(B) *Chicago Health Clubs, No. 77–1227*

*Chicago Health Clubs* is, at first sight, quite similar factually to *Saxon Paint.* The company's sixteen stores (clubs) are in a similar geographic proximity to each other. Many of its operations and procedures are centralized.

■ Other similarities are readily apparent. Chicago Health Clubs has two area supervisors (similar to Saxon's district managers) who oversee its sixteen clubs. These supervisors visit their respective clubs two or three times a week and maintain frequent telephone contact. Despite these similarities, we conclude that substantial evidence supports the Board's finding that a single club is an appropriate bargaining unit.

Notably absent in this case is any prior history of collective bargaining. In addition, the extent of employee interchange among the various clubs is minimal.[16] Furthermore, there are significant differences in the functional integration of the clubs,

*State Farm Mutual Automobile Insurance Co. v. NLRB,* 411 F.2d 356 (7th Cir.) *(en banc), cert. denied,* 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83 (1969).

**16.** The record establishes that all employee transfers at the Schaumburg facility, the club in question, involved only sales trainees. Sales trainees constitute a small fraction of the unit employees. There is no evidence that any of the other unit employees such as instructors or attendants were ever transferred, whether permanently or temporarily, to or from the Schaumburg facility.

the extent to which the company is centralized, and the degree of autonomy of the local club managers.

Unlike the Saxon stores which are virtually identical with each other, Chicago Health Clubs operates at least three types of clubs. Some clubs exclusively serve women, others serve men on one day and women on another. Still others serve men and women on the same day. The clubs also differ in the type of facilities available. Some have handball courts, others have swimming pools. One has a tennis court.

Although many aspects of the company's operations and procedures are centralized, they are not as highly centralized as in *Saxon Paint*. For example, even though official personnel and payroll records are maintained at the central office, each club manager also maintains records detailing needed information about the club employees. Similarly, the central office controls the advertising for all sixteen clubs, but the advertising may be directed at only one geographical area or may be on behalf of only one of the clubs.

Also unlike the store managers in *Saxon Paint*, the club managers exercise a marked degree of control over personnel and labor relations matters. Applicants apply at the individual clubs and are interviewed by the club manager without further interview by the area supervisor. Part-time employees, a large number if not a majority of all employees, are hired and fired by the club manager without consultation with the area supervisor. Although full-time employees are hired with the approval of the area supervisor, the decision is based on the applicant's interview with the club manager.[17] In hiring, the club manager sets the wage rate for new employees within the perimeters determined by the area supervisor.

Additionally, unlike the store managers in *Saxon Paint*, the club managers here exercise considerable disciplinary authority over rank-and-file employees. A club manager may reprimand employees without prior approval. Moreover, in extreme cases, the club manager has the authority to discharge or suspend employees without prior consultation with the area supervisor.

The club manager exercises control over the working conditions of employees in many other respects. For example, the club manager handles employee complaints and grievances about wages and hours, schedules vacations, grants or denies overtime, decides whether employees may take their lunch break on or off the premises, administers the local payroll system, and trains employees in exercise instruction and sales. Thus, unlike *Saxon Paint* and like *Walgreen*, much of the day-to-day employment activities are supervised directly by the local club manager "without significant interference" by the central corporate organization.

Based on the autonomy of the club manager, the insubstantial amount of employee interchange among the metropolitan clubs, and the absence of any collective bargaining history, we conclude that the Board's determination that a single store was an appropriate bargaining unit is reasonable in light of all the facts presented in this case. Since Chicago Health Clubs has admitted its refusal to bargain with the union representing this single club, we accordingly enforce the Board's order.

In summary, the Board's order in No. 77–1227 shall be enforced. Enforcement of the Board's order in No. 77–1504 is denied.

---

17. In one instance, the club manager hired an employee despite substantial concern expressed by the area supervisor.