MEDLINE INDUSTRIES, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 77–2185.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1978.

Decided Feb. 26, 1979.

S. Richard Pincus, Chicago, Ill., for petitioner.

Lynne E. Deitch, N. L. R. B., Washington, D. C., for respondent.

Before PELL and TONE, Circuit Judges, and WHELAN, Senior District Judge.*

PELL, Circuit Judge.

This is a petition for review of an order of the National Labor Relations Board (Board) which adopted the recommended order of an Administrative Law Judge (ALJ). The ALJ concluded[1] that Medline Industries, Inc. (the Company)[2] violated §§ 8(a)(1), (3), and (5)[3] of the National Labor Relations Act (Act). He set aside the results of a representation election held on June 23, 1975, in which the employees re-

jected union representation by a vote of 16 to 5, with 7 challenged ballots. He also ordered the Company to bargain upon request with Teamsters Local No. 743 (the Union) pursuant to the dictates of *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

The Company argues that neither the findings of unfair labor practices nor the *Gissel* bargaining order is supported by substantial evidence from the record considered as a whole as required for enforcement by this court. *Universal Camera Corp. v. N.L. R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We will first review the Company's contentions regarding the propriety of the bargaining order and then look at the validity of the unfair labor practices findings.

## I. THE *GISSEL* BARGAINING ORDER

In *Gissel*, 395 U.S. at 594, 614, 89 S.Ct. at 1930, the Supreme Court upheld the Board's remedial authority to order an employer to bargain with a union when the union has obtained authorization cards from a majority of the employees in an appropriate unit and when the employer has committed unfair labor practices which "interfere with the [Board's] election processes and tend to preclude the holding of a fair election." The Court indicated that this extraordinary remedy would be appropriate if the "Board finds that the possibility of erasing the effects of past practices and ,of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is

---

* Senior District Judge Francis C. Whelan of the Central District of California is sitting by designation.

1. Our reference throughout this opinion to actions of the ALJ shall be considered actions of the Board because the Board adopted the recommended findings and order of the ALJ.

2. The Company manufactures and distributes medical and hospital equipment and supplies. Its corporate headquarters and primary warehouse are located in Northbrook, Illinois. In addition to warehousemen, the Company employs "kit makers" at the warehouse who assemble and package customized kits of merchandise.

3. Section 8(a)(1) provides: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

   Section 8(a)(3) provides in pertinent part: "It shall be an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3).

   Section 8(a)(5) provides: "It shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(5).

slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order . . . ." *Id.* at 614–15, 89 S.Ct. at 1940.

In the present case, the Company contests the appropriateness of the bargaining order on the ground that the Union did not have the requisite authorization cards from a majority of the employees in the appropriate unit. The ALJ found that the Union had properly secured authorization cards from 16 employees by May 15, 1975, the date the Union wrote the Company demanding recognition. On that date, the ALJ found, the unit consisted of 28 employees. The Company received the demand letter on May 19, 1975 at which time, the ALJ found, the unit consisted of 29 employees. The parties stipulated that the appropriate unit was defined as

> all full-time and regular part-time warehouse employees at the employer's warehouse now located at 1825 Shermer Road, Northbrook, Illinois, including summer employees and kit makers; but excluding clerical employees, janitors, sales trainees, guards and supervisors as defined in the Act. . . .

The Company argues that the Board improperly excluded from the unit employees Lowman and Thurman and that the Board improperly counted the authorization cards of employees Youngs and Witt who the Company alleges signed their cards only after union misrepresentations and coercion. If the Company is correct regarding at least three of these four employees, the Union did not have a majority of authorization cards and the bargaining order cannot be enforced. We will analyze the Company's arguments and the evidence supporting the Board's findings as to these employees. We do so, of course, fully recognizing that we must enforce the Board's findings if there is substantial evidence in the record considered as a whole to support them.

A. *The Board's Exclusion of Roosevelt Thurman*

■ The ALJ found that Thurman was not a member of the unit on May 15 or 19, the critical dates on which majority status

was determined. He found that Thurman was "no longer a regular employee . . . and there is no reasonable likelihood or expectation of his return as such in the foreseeable future." The ALJ, however, did not focus on the critical dates and ignored well-established Board law, enforced by the courts, that employees on sick leave are presumed to remain in that status for unit eligibility purposes until recovery, and a party seeking to overcome that presumption must affirmatively show that the employee has resigned or been discharged. N.L.R.B. Outline of Law & Procedure in Representation Cases at 284 (1974); *see N.L.R.B. v. Staiman Brothers*, 466 F.2d 564, 566 (3d Cir. 1972); *Lake City Foundry Company v. N.L.R.B.*, 432 F.2d 1162, 1170 (7th Cir. 1970); *Food Employees, Local 347 v. N.L.R.B.*, 137 U.S.App.D.C. 248, 252, 422 F.2d 685, 689 (1969); *Trailmobile Division, Pullman, Inc. v. N.L.R.B.*, 379 F.2d 419, 423 (5th Cir. 1967); *Miami Rivet Company*, 147 N.L.R.B. 470, 483 (1964); *L. D. McFarland Co.*, 121 N.L.R.B. 577, 578 (1958); *Sylvania Electric Products, Inc.*, 119 N.L.R.B. 824, 832 (1957); *Foley Manufacturing Co.*, 115 N.L.R.B. 1205, 1206 (1956); *Wright Manufacturing*, 106 N.L.R.B. 1234, 1236–37 (1953).

Thurman had worked continuously for the Company since January 1972. In January 1975 he was placed on medical leave as a result of a kidney ailment. He was not terminated until May 30, 1975, well after the critical dates for determining the card majority. He gave the Company no reason to believe that he would not return to work until he failed to respond to the Company's May 22, 1975, letter inquiring of his expected return date. That he was on sick leave on May 15 and 19, and thus a member of the unit, is supported by uncontradicted and compelling evidence. For example, the Company provided Thurman, during this sick leave from January 1975 through May 1975, its complete package of fringe benefits, including hospitalization, and salary continuation and life insurance.

The Board's only evidence that Thurman should have been excluded because he was

not an employee on the critical dates is that the Company's "New Employee Guide" provides that Company policy does not permit a leave of any sort for more than 21 days for an employee with less than three years seniority. (Thurman had slightly less than three years seniority when he went on sick leave.) The Board argues that under this policy Thurman was terminated 21 days after he began his sick leave in January 1975. Reliance on this "New Employee Guide" does not provide substantial evidence to support the Board's position because the Company's continuation of benefits indicates that it did not apply the policy to Thurman. Furthermore, Thurman returned to work on March 24, 1975, and worked a full day. If the Company policy expressed in the Guide applied to him, he would not have been permitted to return on that date. Consistently with this conduct, a Company official testified that the sick leave policy in the Guide did not apply to employees, including Thurman, who had been with the Company prior to the introduction of the Guide. Our review of the evidence, therefore, reveals no substantial evidence to support the Board's exclusion of Thurman from the appropriate unit.

B. *The Board's Exclusion of Virginia Lowman*

■ The ALJ excluded Lowman from the unit notwithstanding objections from the Company. The ALJ concluded that Lowman had the "hallmarks of a supervisor," and that if she was not a supervisor, as defined by the Act, she was "basically a 'clerical employee,' a category expressly excluded from the stipulated unit." The ALJ ultimately relied on the latter ground.[4] Accordingly, we now turn to the evidence supporting Lowman's classification as a clerical employee.

Lowman spent at least 70% of her time in the warehouse making kits, and spent only a small portion of her time in the office area doing clerical work. Employees who perform dual functions are treated like part-time employees for unit determination purposes. *N.L.R.B. v. Ga., Fla., Ala. Transp. Co.*, 566 F.2d 520, 522 (5th Cir. 1978). Even if they spend less than a majority of their time on unit work, they are included in the unit so long as they regularly perform duties similar to those performed by unit employees, for sufficient periods of time to demonstrate that they have a substantial interest in working conditions in the unit, and thus that they share a community of interest with the unit employees. *See Alterman Transport Lines*, 178 N.L.R.B. 122, 127 (1969); *Faulks Bros. Construction Co.*, 176 N.L.R.B. 324, 330 (1969); *Berea Publishing Co.*, 140 N.L.R.B. 516, 519 (1963).

We are of the opinion that the record does not contain substantial evidence to support the ALJ's decision to exclude Lowman. Prior to March 1974, Lowman worked full time in the warehouse as a kit maker and handled the related paperwork in the kit making area of the warehouse. She took on some additional clerical work in March 1974 until June 1975. This clerical work, however, was minimal, and appears to have been primarily a temporary measure to fill in for a secretary who could not arrive before 8:45 a. m. Lowman was asked to perform her kit assembly and paperwork functions in the office between 8:00 a. m. and 8:45 a. m. and during the noon lunch hour and to answer the phone for that secretary during these times. These were the only times she spent in the office area. Her only other clerical duties were routine handling of piece work tickets and other forms relative to the receipt and shipment of orders. These were plant clerical duties which she normally performed at a table in the kit assembly area in the warehouse,[5] and did not constitute a signifi-

---

4. It is quite clear that Lowman did not exercise any of the authority required by § 2(11) of the Act to satisfy the definition of a supervisor.

5. Although Lowman could not be considered an office clerical given the short time she spent in the office and the relatively minimal clerical functions she performed, a recent Board decision indicates that office employees must be included in a production and maintenance unit if such employees have frequent contact with unit employees, share common supervision,

cant portion of her work time. Of the little time that she spent in the office area, 90% of that time was devoted to kit making or paperwork directly associated therewith. Unlike the office clericals, she punched the same time clock as the other unit employees.

In essence, Lowman's primary function was that of a kit maker with some related clerical work. She performed generally the same work as the unit employees, and performed that work most of the time in the same location as the unit employees. It is incongruous to conclude, as did the ALJ, that she did not share a community of interest with the unit employees. We recognize the Board's expertise in unit determination issues, and do not lightly conclude that the Board has acted arbitrarily and abused its broad discretion in this area. *See N.L.R.B. v. Chicago Health & Tennis Clubs, Inc.*, 567 F.2d 331 (7th Cir. 1977) *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133; *N.L.R.B. v. J. C. Penney Co., Inc.*, 559 F.2d 373, 375 (5th Cir. 1977). The present case, however, requires us to conclude just that.

C. *The Validity of Paul Youngs' Authorization Card*

■ The ALJ upheld the validity of Paul Youngs' authorization card and thus counted it as one of the 16 cards used to establish a majority on the critical dates. The Company argues that Youngs' card should not have been counted because the Union secured it by improper means. The law is clear that "signatures on authorization cards [must] be obtained only by proper methods so that they will truly represent a reasoned choice by employees." *N.L.R.B. v. Montgomery Ward & Co.*, 399 F.2d 409, 413 (7th Cir. 1968). *See also L. C. Cassidy & Son, Inc. v. N.L.R.B.*, 415 F.2d 1358, 1363–64 (7th Cir. 1969); *N.L.R.B. v. Dan Howard Mfg. Co.*, 390 F.2d 304, 308–09 (7th Cir. 1968). Because authorization cards are "inferior to the election process" for determining employee choice, *Gissel*, 395 U.S. at 603,

and perform clerical functions that are an integral part of the production process. *American*

89 S.Ct. 1918, they must be "scrutinize[d] with great care . . . [and the Board] must establish that the signer of the card did, in effect, do what he would have done by voting in a Board election." *N.L.R.B. v. J. M. Machinery Corp.*, 410 F.2d 587, 591 (5th Cir. 1969).

The uncontradicted testimony of Youngs shows that he openly expressed his intent not to sign the authorization card during a two-day period prior to signing it. It further shows that he signed only after being subjected to repeated pressures and material misrepresentations by the Union. Union representatives approached Youngs on at least 11 occasions on May 13 and countless times on May 14 before he signed on May 15. Before capitulating on May 15, he adamantly refused to sign because of a strong opposition to unions based in part on an earlier experience when he was threatened with violence because of his non-union status.

During the two or three days Youngs was pressured by the Union, he was repeated vilified as a "Company man" and a "sell out." The Union adherents harassed him with demeaning questions such as, "What is wrong? Patty [Youngs' wife] won't let you sign the card?" Youngs even left the plant vicinity to eat lunch alone on May 14 to avoid the constant harassment. On May 15, he found the words "Sold Out" written on his order box and on his handcart. That afternoon, John Liston, who had been attempting to get Youngs' signature on an authorization card, confronted Youngs and badgered him to sign for five or ten minutes. Youngs' uncontradicted testimony regarding this was as follows:

Jack Liston approached me and said, "Paul, why don't you want to sign the card?"

And you know, "Why do you insist on sticking with the company and being a company man?"

And I said, "Because I just don't want to sign the card, I just want to be left alone."

*Optical Corp. Safety Products Divn.*, 236 N.L.R.B. No. 121 (1978).

And he said, "Well, everybody, you know, *everybody has signed the cards, why don't you?*"

And I said, "Everybody has not signed the card, as you just said, I have not signed the card, so everybody has not signed the card."

And he says, "Why don't you sign the card? After all, it is just for an election."

And I said, "Because I just don't want to sign the card, . . .."

Finally, Youngs capitulated and said, "Give me the God-damn card, I will sign it." The next day Youngs asked Jamison, the primary Union organizer, if he had mailed in his card. When Jamison told him he had, Youngs said, "That is too bad." Shortly thereafter, Youngs asked Noel Sterling, Company Vice-President, if there was any way he could retrieve his card, and was told, "Once they have it, there is probably no way you can get it back."

■ These facts indicate that the Union used improper methods to obtain Youngs' signature on an authorization card. The fact that Youngs was told immediately prior to signing, that all the other employees had signed, would in itself be sufficient to invalidate the card. *See Lake City Foundry Company v. N.L.R.B.*, 432 F.2d 1162, 1172 (7th Cir. 1970) ("a card was invalid if obtained on the misrepresentation that a majority of the employees had signed . . . ."); *N.L.R.B. v. Dan Howard Mfg. Co.*, 390 F.2d 304, 308 (7th Cir. 1968). In the present case, in addition to this flagrant misrepresentation, the Union, at least at one critical point, misrepresented the purpose of the authorization card. Liston assured Youngs just prior to obtaining his signature that the card "is *just* for an election." In *Gissel* the Court approved the Board's *Cumberland Shoe* rule [144 N.L.R.B. 1268 (1963)] governing the validity of authorization cards,

if the card itself is unambiguous (i. e. states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election.

395 U.S. at 584, 606, 89 S.Ct. at 1925. In the present case there is no allegation that the card was ambiguous, so its validity can be challenged under the *Cumberland Shoe* rule only if the unambiguous language on the card "is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." *Id.* at 606, 89 S.Ct. at 1936. If Liston's statement regarding the purpose of the card were the only communication to Youngs on the subject, there is little doubt that the card would be invalid; but the record reveals that Youngs was present at a meeting of employees on May 13 during which Jamison explained that the cards "would allow the Union to present a demand for recognition to [the Company], which [the Company] could refuse or not refuse . . . .."

Arguably, the May 15 communication from Liston was more likely to have had a sharper impact on Youngs because of the intensity of the conversation, because of its temporal proximity to his signing, and because it was made during a bilateral conversation rather than during a meeting in which the attention of the listener is often less focused. Moreover, Liston's May 15 statements, if sufficient to cancel the language on the card, arguably were sufficient to cancel prior oral statements made on May 13. Nevertheless, this is a close question which we need not reach in this case in light of our conclusion that Youngs' card should have been invalidated because of Liston's statements that all the other employees had signed cards. Liston's misrepresentations regarding the *purpose* of the card, however, buttress our conclusion.[6]

■ Most of the testimony regarding the Union's misrepresentations and harass-

---

6. We are mindful of the Board's admonition to consider the totality of the circumstances surrounding the card solicitation. *Levi Strauss &* *Co.*, 172 N.L.R.B. 732, 733 n.7 (1968), *enforced*, 142 U.S.App.D.C. 337, 441 F.2d 1027 (1970).

ing tactics used to secure Youngs' card was that of Youngs himself. Jamison corroborated some of Youngs' testimony. Notwithstanding the fact that Youngs' testimony was uncontradicted,[7] the ALJ discredited his testimony and was thus able to count Youngs' card.[8] Generally, we do not overturn findings based on credibility resolutions because, "[a]bsent exceptional circumstances, credibility resolutions are within the province of the trier of fact." *Electri-Flex Co. v. N.L.R.B.*, 570 F.2d 1327, 1331–32 (7th Cir. 1978) *cert. denied*, —— U.S. ——, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978). But "[i]n a proper case [the reviewing court] may decline to follow the action of an examiner in crediting and discrediting testimony, even though the Board has adopted the Examiner's findings." *N.L.R.B. v. Elias Bros. Big Boy, Inc.*, 327 F.2d 421, 426 (6th Cir. 1964).[9] We are of the opinion that the ALJ's discrediting of Youngs' uncontradicted testimony presents us with the proper case for declining to follow the ALJ's action. The Eighth Circuit addressed this issue as follows:

> An examiner may give credence and weight to the testimony of the general counsel's witnesses in preference to that of the employer. . . . But, a complete disregard for sworn testimony coupled with a tongue-in-cheek characterization of those utterances . . . depreciates the examiner's findings and obliges our close examination.

*Banner Biscuit Company v. N.L.R.B.*, 356 F.2d 765, 768 (8th Cir. 1966). Similarly, our court has stated that "inferences contrary to direct testimony are not ordinarily sufficient to support a finding [by an ALJ]." *N.L.R.B. v. Kaye*, 272 F.2d 112, 114 (7th Cir. 1959). More recently, the Fourth Circuit opined:

"[W]here material uncontradicted evidence has been ignored, . . . or where the evidence has been disregarded or eliminated by the casual expedient of discrediting an employer's witnesses, . . . the result is that the Trial Examiner's report and the Board's findings will not be accorded the presumption of correctness usually attributed to the trier of fact."

*N.L.R.B. v. Huntington Hospital, Inc.*, 550 F.2d 921, 924 (4th Cir. 1977), *quoting N.L.R.B. v. United Brass Works, Inc.*, 287 F.2d 689, 691 (4th Cir. 1961).

Youngs' testimony was not incredible or even unworthy of belief when viewed in the context of the other evidence. Moreover, there was no evidence or even inferences that could be drawn from the evidence to contradict his testimony. If we were to condone the ALJ's actions, we would be acting as nothing more than a rubber stamp, a role we choose not to assume even in reviewing credibility determinations.

In addition, in our review of the proceedings before the ALJ, we perceived some hostility by the ALJ toward the Company that may have affected the objectivity of his credibility determinations. Because we have overturned the ALJ's credibility determination regarding Youngs on other grounds, we need not address this problem other than to note that the ALJ's apparent hostility may explain his unusual actions in this case. We have attached an appendix in which we juxtapose his credibility determinations of the Company and the Board witnesses. We do not suggest that simply because an ALJ uniformly credits one party's witnesses and discredits the other party's witnesses, there is conclusive or even weighty evidence of bias. *See N.L.R.B. v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659–60, 69

---

**7.** The Board did not call Liston to rebut Youngs' critical testimony regarding his conversations with Liston.

**8.** The ALJ discredited Youngs on the basis of his "embarrassed posturings and facial configurations," and the fact that he "is still in [the Company's] employ and testified under its watchful eye . . . .."

**9.** The Ninth Circuit has stated that a reviewing court may interfere with the Board's credibility determinations "only if a clear preponderance of the evidence convinces us that they are incorrect." *N.L.R.B. v. R. O. Pyle Roofing Co.*, 560 F.2d 1370, 1371–72 (9th Cir. 1977); *N.L.R.B. v. International Longshoremen & W.U.*, 514 F.2d 481, 483 (9th Cir. 1975).

S.Ct. 1283, 93 L.Ed. 1602 (1949). In the present case, however, these actions provide additional support for our decision to decline in part to follow the ALJ's credibility determination. *See N.L.R.B. v. Bush Hog, Inc.,* 405 F.2d 755, 756 (5th Cir. 1968).

■ Having concluded that the ALJ improperly counted Youngs' authorization card and that he improperly excluded Lowman and Thurman from the unit, the Union did not have signed authorization cards from a majority of the employees in the stipulated unit on either May 15 or 19. Consequently, we cannot enforce the Board's *Gissel* bargaining order or its § 8(a)(5) finding.[10]

## II. THE REMAINING UNFAIR LABOR PRACTICES

■ The ALJ found that the Company violated § 8(a)(1) of the Act by coercively interrogating employees, by broadly proscribing talk about the solicitation for a union by employees during nonworking times, by inducing an employee to withdraw unfair labor practice charges filed against the Company, and by threatening plant closure if the employees selected the Union as their collective bargaining representative. The ALJ also found that the Company violated § 8(a)(3) and (1) of the Act by discharging because of their union activities employees Mark Jamison, Mark Kenney, Douglas Kline, Donald Holland, John Chorba, Gregory Fair, Daniel Weckler, and John Ford, Jr. We have reviewed these findings and notwithstanding the closeness of the case created by the arguably biased and non-objective attitude of the ALJ, we are of the opinion that there is sufficient substantial supportive evidence in the record as a whole to preclude our denying enforcement. We, therefore, enforce the Board's order regarding these unfair labor practices.[11]

ENFORCEMENT GRANTED IN PART, DENIED IN PART.

## APPENDIX

| *Employer Witnesses* | *Board Witnesses* |
|---|---|
| *Barry Fript* | *Daniel Weckler* |
| ". . . this incredible denial" | ". . . testified with impressive credibility . . ." |
| ". . . Fript's unpersuasive denials, as well as his similarly lame professed inability to 'recall'" | ". . . Weckler, an unusually cleancut and forthright witness . . ." |
| ". . . I further reject and discredit as unworthy of belief, Fript's 'explanation' . . ." | |
| "According to Fript — a witness of unprepossessing mien" | |
| ". . . Fript's unconvincing yarn . . ." | |

10. The Company also argued that the ALJ improperly counted Ed Witt's authorization card. We need not reach this argument in light of our conclusion that the Union did not have the requisite majority on the relevant dates. For the same reason we need not examine the Board's *Gissel* findings to determine whether they are sufficiently specific to satisfy the standards outlined by this court in *Peerless of America, Inc. v. N.L.R.B.,* 484 F.2d 1108, 1118–19 (7th Cir. 1973).

11. The Supreme Court in *Gissel* acknowledged a category of cases in which the Board could consider issuing a bargaining order without a finding that the Union had obtained authorization cards from a majority of employees in the unit. *Gissel,* 395 U.S. at 613–14, 89 S.Ct. 1918. Such a remedy, however, is reserved for those "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices. The present case does not fall within this category. Moreover, the Board "appears unwilling to concede that it can issue a bargaining order in the absence of proof of an earlier majority even when the employer's violations have been outrageous and pervasive, *Loray Corp.,* [184 N.L. R.B. 557 (1970)]" Gorman, Basic Text on Labor Law at 97 (1976).

*Employer Witnesses*                    *Board Witnesses*

"Fript . . . brazened it out by bland-
ly prevaricating to Sterling . . ."

". . . the preposterous nature of this
'explanation' as utterly unpersuasively deliv-
ered by a witness (Fript) sadly deficient in
testimonial demeanor impressiveness . . ."

*Noel Sterling*                         *Keith Wessling*

". . . testimony of Sterling as well as       "I fully credit this testimony of the two
Mills — likewise unpersuasive . . ."          Wessling brothers, who consistently demon-
                                              strated themselves to be witnesses of high
". . . considering Sterling's demonstrat-     order."
edly aberrant powers of recollection . . ."

". . . Sterling's implausible account
. . ."

*Dennis Paul Youngs*                    *Douglas J. Kline*

". . . After observing and assessing    "Kline demonstrated himself to be a highly
Youngs' embarrassed posturings and facial     credible witness with a precision of factual
configurations as he delivered himself of     delivery impervious to searching cross-exam-
this testimony, I do not believe it."         ination."

"Youngs' ill-concealed, smoldering rancor
toward Jamison may well have colored his
account of the purported events he de-
scribed, which may thereby have taken on a
different coloration in his mind; . . . I
had the impression that he was at least
embellishing, if not creating, while he was
on the witness stand. He is still in Respond-
ent's employ and testified under its watch-
ful eye as its seemingly willing and not
disinterested witness."

*Edward M. Witt*                        *Mark Jamison*

". . . he testified to vacillating, stum-     ". . . Jamison impressed me well, par-
bling, and varying versions of the alleged    ticularly considering the effectiveness with
circumstances . . ."                          which he withstood lengthy and grueling
                                              cross-examination . . ."
". . . my impression of Witt as a
seemingly uneasy and slippery witness anx-
ious not to displease his employer, and per-
haps unable to draw a sharp line between
hard facts as they truly occurred and *post
facto* redesign possibly prompted by current
self-interest and to that end unskillfully re-
storing to an allegedly defective and bleary
memory . . ."

*James Mills*

". . . much of whose testimony in view
of the finely minced and equivocating se-
manticisms in which he indulged, his cau-
tious evasiveness, his highly refined quali-
ficational language and gingerly factual se-

*Employer Witnesses*

lectiveness, his inconsistencies, his interest, his antiunion animus, and his testimonial demeanor as closely observed, I am constrained to view, within the total circumstances of this case, with a degree of caution and reserve."

". . . it is such seeming testimonial mincing or sparring which gave me unease in accepting unreservedly his testimonial productions."

". . . this convoluted rationale . . ."

". . . labored 'explanation' . . ."

". . . transparent canard . . ."

". . . Mills' canard . . ."

". . . Mills' incredible alleged explanation . . ."