NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DEL REY TORTILLERIA,
INC., Respondent.

No. 85–1199.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1986.

Decided April 2, 1986.

Joseph Oertel, Dep. Assoc. Gen. Counsel N.L.R.B., Washington, D.C., for petitioner.

Irving M. Geslewitz, Adams, Fox, Adelstein & Rosen, Chicago, Ill., for respondent.

Before WOOD and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

The National Labor Relations Board (NLRB or the Board) petitions this court to enforce an order[1] requiring respondent, Del Rey Tortilleria, Inc. (the Company), to cease and desist from interfering with its employees' exercise of their rights under section 7 of the National Labor Relations Act[2] (the Act) and to offer reinstatement to former employees discharged in violation of the Act. We enforce the order.

## I

The following statement of the facts is derived from the findings of fact contained in the Decision of the Administrative Law Judge (ALJ's Decision):[3] The Company is a family-owned corporation which operates retail and wholesale facilities on 18th and 27th Streets in the Pilsen or Little Village area of southwest Chicago. During the relevant period, the Company, which produces tortillas and related Mexican food products, employed some seventy unskilled workers at the 27th Street facility and approximately forty unskilled employees at its 18th Street factory. Nearly all of the employees are of Mexican descent. Some are undocumented aliens. Most are poorly-educated immigrants with little working knowledge of English who work for minimum wage.

In the summer of 1982, Refugio Martinez, the Company's vice-president and chief operating officer, was away in Mexico on business. In his absence, his step-daughters were left in charge: Dorothy de la Torre managed the 27th Street facility with the assistance of supervisor Pilar Ramirez; Yolanda Carreon managed the 18th Street operation. In late September, Luis Maldonado and several other employees

asked Mrs. de la Torre to establish a regularly-scheduled break time to replace the arbitrary system then in operation. She replied that the employees were a "bunch of pigs" and that, because they made a "mess of the lunchroom," she would not give them a regular break. These employees were then sent home prior to the end of their shifts. Thereafter, Mr. Maldonado contacted Local 76 of the International Ladies' Garment Workers Union (Union).

On or about October 1, 1982, one of the Union's organizing directors, Rudolfo Lozano, began an organizational drive at both of the Company's facilities. Mr. Lozano stood on the sidewalk outside of the plants and spoke to employees entering and leaving the plants. He also held organizational meetings at a local community center. At these meetings, blank authorization cards were given to employees for distribution and signed cards were collected. After a meeting at the community center on October 6, the organizational drive began in earnest. On October 13, two days before the Union filed its representation petition, Mr. Lozano sent a telegram to Mrs. de la Torre. The telegram informed her that the Union was involved in an organizing drive and told her that "our organizing committee consists of the following employees— Luis Maldonado, Enelida Diaz, and Jose Luis Arriaga."

Certain subsequent actions of the Company, which are detailed *infra*, were alleged by the Union to be unfair labor practices designed to thwart the organizational effort. Charges were filed by the Union on October 14. The Board, adopting the findings of the ALJ, decided that the Company had violated both sections 8(a)(1) and (3) of the Act. 29 U.S.C. §§ 158(a)(1), (3) (1984).

---

**1.** The Board's order, which was issued November 14, 1984, is reported at 272 N.L.R.B. No. 175.

**2.** Section 7 of the National Labor Relations Act provides that:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to

engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection and shall also have the right to refrain from any or all of such activities....

29 U.S.C. § 157 (1984).

**3.** The Decision of the Administrative Law Judge (ALJ's Decision) is found in the Record at Volume I, "Pleadings," Item 2, pp. 1–19.

The Board issued an order requiring the Company to cease and desist from engaging in the activities underlying the unfair labor practices, to reinstate the three employees discharged in violation of the Act, and to post remedial notices.

## II

### A

Our review of Board orders is limited. "Factual findings supported by substantial evidence in the record as a whole are conclusive." *NLRB v. Jarm Enterprises, Inc.*, 785 F.2d 195, 199 (7th Cir.1986) (quoting *International Union of Operating Engineers v. NLRB*, 755 F.2d 78, 81 (7th Cir.1985)); *see* 29 U.S.C. § 160(e) (1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Substantial evidence has been described as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed.2d 126 (1938). In determining whether there is substantial evidence in support of the Board's position, we must be satisfied—based on our independent review of the record—that the result is "justified by a fair estimate of the worth of the testimony of witnesses or [the Board's] informed judgment on matters within its special competence...." *Universal Camera*, 340 U.S. at 489–90, 71 S.Ct. at 465.

The determinations of the Board in this case are based on the findings of the ALJ. These findings are all based on his resolution of conflicting testimonial evidence. The Company argues that the ALJ was biased in favor of the Union. This argument is founded on the fact that the ALJ credited the testimony of the Board's witnesses more often than he credited the testimony of the Company's witnesses. However, we agree with the Board's position that, "[t]here is no basis for finding that bias and partiality existed merely because an administrative law judge resolved important factual conflicts in favor of the General Counsel's witnesses." *Penn Color, Inc.*, 261 N.L.R.B. 395, 395 (1982). Further, "[t]here is nothing inherently arbitrary ... in believing one side's witnesses and not the other's." *Conair Corp. v. NLRB*, 721 F.2d 1355, 1367–68 (D.C.Cir. 1983). Moreover, it has long been the law in this circuit that a reviewing court "must accept the Board's credibility findings unless the party challenging the credibility determinations establishes 'exceptional circumstances.'" *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir.1984); *see Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir.1979); *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331–32 (7th Cir.), *cert. denied*, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256 (1978).

The Company appears to argue that exceptional circumstances exist in this case. It seemingly contends that, since many of the General Counsel's witnesses were former Company employees whose terminations had been challenged as unfair labor practices, the testimony of these witnesses is too untrustworthy to constitute the substantial evidence necessary to support the Board's findings. *See Midwest Stock Exchange, Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980). According to the *Midwest* court, a reviewing court may "disregard [the ALJ's] credibility determinations where we find them to be unreasonable, self-contradictory or based on inadequate reasoning." *Id.* However, that is not the situation in this case. The ALJ's task here was not an easy one. Apart from the Company's witnesses, most of the witnesses spoke only Spanish. Therefore, their testimony was taken through an interpreter, and it is clear that the language barrier complicated the hearing process. As the ALJ himself noted, "the interpreters who were called upon to render translations to and from the colloquial Mexican Spanish were not well suited to their tasks." ALJ's Decision at 3 n. 6. In this case, the ALJ very competently monitored the translation process. He tried to ensure not only that the witnesses understood the

questions they were asked but also that the translators understood the nuances of the questions and that the witnesses' answers were accurately interpreted. The ALJ alone had the opportunity to hear the testimony and observe the witnesses' demeanor; thus, he was best suited to assess credibility and to resolve conflicts in testimony. *Portable Electric Tools, Inc. v. NLRB*, 309 F.2d 423, 426–27 (7th Cir.1962). There are minor conflicts between testimony at the hearing and the affidavits. However, these minor discrepancies are substantially overcome by the balance of the testimony and consideration of the language problem.

### B

It is against this backdrop that we must evaluate the Board's findings. Section 8(a)(1) of the Act provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1984). In this case, the Board found that fifteen discrete acts of the Company interfered with the organizational rights of the employees. The Company does not argue that any challenged conduct, if it actually occurred, would be permissible under the Act. Rather, it argues that the ALJ improperly credited the testimony of the Union and that the ALJ's findings are not supported by substantial evidence on the record viewed as a whole. In essence, the Company argues that the alleged acts never occurred.

The ALJ credited the testimony of several employees that the Company, on three separate occasions, promised them raises if

they would abandon the Union.[4] Additionally, on October 17, Luis Maldonado had two conversations with Mrs. Ramirez, the 27th Street plant supervisor, regarding the Union. In the first, Mrs. Ramirez promised that, if the employees would renounce the Union, Mrs. de la Torre would pay them for any time they had lost. In the second, Mr. Maldonado was told that, if he would get rid of the Union, the Company would give him a check in any amount.[5]

The ALJ also found the Company guilty of conducting several coercive interrogations. It was found that, at the October 13 meeting, employee Enelida Diaz was subjected to coercive interrogation by Mrs. Ramirez. Specifically, Ms. Diaz was asked which employees were in the Union and why they needed a union at all. On October 11, another employee, Guillermo Ruiz, was called into Mrs. de la Torre's office. Mrs. de la Torre asked Mr. Ruiz if he was involved in the Union. When Mr. Ruiz denied involvement, Mrs. de la Torre told him that, if he were involved in the Union, she would suspend him for three days just as she had suspended Luis Maldonado. In a separate incident, Mr. Maldonado was questioned regarding the need for a union. Other instances of coercive interrogation were found in the termination interviews of employees Chavez and Paniagua. Both were asked about their status with respect to the Union. When they admitted to membership, they were each told that they no longer had jobs. Mr. Paniagua was also threatened with a visit from the police if he failed to cooperate.[6]

Other acts of interference with the employees' section 7 rights were found by the

---

**4.** The workers at both facilities, generally, were paid only minimum wage. Thus, the promise of a twenty-five cent per hour raise represented nearly a seven and a half percent salary increase. NLRB Br. at 6 n. 4.

The wage increase promises were made on three separate days. First, on October 7, the day after the first organizational meeting, Ramirez called a meeting of the night shift employees at the 27th Street plant. She told them that Refugio Martinez had authorized her to promise the employees a twenty-five cent per hour raise *if* they abandoned the Union. One week later,

on October 13, a similar meeting was called by Ramirez and similar promises were made. The following day, another meeting of some thirty employees was called. At this meeting, Santiago Torres, a Company supervisor, repeated Ramirez' promise that a raise would be paid if the employees abandoned the Union. ALJ's Decision at 4–6.

**5.** ALJ's Decision at 7.

**6.** ALJ's Decision at 4–7.

ALJ. First, on October 15, two days after the Union notified the Company of the organizational effort, the employees were scheduled to be paid. The Company posted a notice which required employees to present two forms of identification in order to obtain their paychecks. Employees requesting their checks were told to present their social security cards and their green cards or "micas" which are issued by the Immigration and Naturalization Service to indicate lawful presence in the United States. Such requests had never been made before; they were never repeated after this date. Further, on several occasions, discharged employees were informed that they were fired, at least in part, because of their union activities. Several employees were informed that they could be reinstated if they would renounce the Union.

This case presents a classic case of anti-union behavior by a company. The day after the first union meeting, the violations began with a promise of wage benefits in return for rejection of the Union. As the Union's organizing drive intensified, so did the Company's retaliatory measures. Indeed, the Company's threatening and hostile posture with respect to employees in the Union carried over to the hearing before the ALJ. In fact, at two separate junctures in his decision, the ALJ noted that Mrs. de la Torre "was making audible comments from the counsel table" thereby affecting the responses of the witnesses. ALJ's Decision at 11 n. 18, 4 n. 7. The Board's findings of section 8(a)(1) violations are supported by substantial evidence.

We must also review the Board's findings with respect to the discharges of several employees. Discharges of employees for union activities are violative of both sections 8(a)(1) and (3) of the Act. Section 8(a)(3) of the Act makes it an unfair labor practice for an employer, "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29

U.S.C. § 158(a)(3) (1984). In section 8(a)(3) cases, motive is a critical factor in determining whether a violation has occurred. *NLRB v. Brown Food Store*, 380 U.S. 278, 286–87, 85 S.Ct. 980, 985–86, 13 L.Ed.2d 839 (1965). When more than one motive is suggested by the evidence, the Board employs the test articulated in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and sanctioned by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). According to these decisions, the General Counsel must make a prima facie showing by demonstrating that "the employee's conduct protected by § 7 was a substantial or motivating factor in the discharge." *Id.* at 400, 103 S.Ct. at 2473. If this showing is made, the burden shifts to the employer to prove that the discharge was not solely based on the employee's protected conduct and that the employee still would have been terminated absent the protected conduct. *Id.* In essence, the employer has an affirmative defense which he must prove by a preponderance of the evidence. *Id.* (citing *Wright Line*, 251 N.L.R.B. at 1088 n. 11).

We note again that our task is not to reweigh the evidence. We must enforce the Board's order with respect to section 8(a)(3) violations if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e); *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464. In this case, the Board decided that the discharge of three employees—Enelida Diaz, Evarardo Chavez and Antonio Paniagua[7]—violated sections 8(a)(3) and 8(a)(1).

We will first discuss the discharges of Messrs. Chavez and Paniagua. The ALJ found that: On October 11, Chavez signed a Union authorization card. On October 14, immediately preceding the meeting called by Mrs. Ramirez to discourage union membership, Mr. Paniagua stepped outside

---

**7.** Paniagua is referred to in the hearing transcript as Antonio Parriagua Martinez.

the plant to speak with Mr. Lozano, the Union's organizer. Mr. Paniagua was observed signing a Union card by Mrs. Ramirez, who was standing only eight to ten feet away. Immediately afterward, Mrs. Ramirez assigned Chavez, Paniagua and others to carry large bags of chili from the second to the third floor of the 27th Street facility. After one trip had been completed, Mrs. Ramirez observed Chavez with an open quart bottle of beer in a paper bag. At the time, Paniagua was in an adjacent room. Mrs. Ramirez asked Chavez if he was drinking. He stated that he was not, that he had found the bottle and intended to throw it away. Mrs. Ramirez confiscated the bottle and told Chavez and Paniagua to change their clothes and punch out. When they were about to leave, Mrs. Ramirez told them that they were laid off for three days. When Mr. Chavez asked for an explanation, Mrs. Ramirez told both men to report to her office.

The ALJ credited the testimony of Messrs. Paniagua and Chavez with respect to what transpired in Mrs. Ramirez' office. He found that Mrs. Ramirez telephoned Mrs. de la Torre and reported her observations. Both employees were asked to speak to Mrs. de la Torre. The ALJ credited Mr. Chavez' testimony that he told Mrs. de la Torre he had not been drinking. Mrs. de la Torre then asked him who belonged to the Union and, specifically, whether Mr. Paniagua was a member. Mr. Chavez answered that he did not know about Mr. Paniagua but admitted that he was in the Union. Mrs. de la Torre then told him that, if he remained in the Union, he was fired; if he withdrew, he could continue working.

Next, Mr. Paniagua took the phone and informed Mrs. de la Torre that he had not been drinking. The ALJ also credited Mr. Paniagua's testimony with respect to the contents of the conversation: Mrs. de la Torre then asked him who was in the Union, and Mr. Paniagua replied that he did not know. Mrs. de la Torre then advised him that, if he knew anything, he should admit it and that she had friends on the police force who she could send to his house. She then told him that, if he was in

the Union, he was fired, but if he would renounce the Union, he could continue to work. When Mr. Paniagua admitted that he was in the Union, Mrs. de la Torre told him that he was fired. She then told him to wait, that she was going to call her lawyer. She called back several minutes later to say that Chavez and Paniagua were both fired. The ALJ also credited the testimony of the two men that they saw the confiscated bag containing the beer bottle in the office bearing the inscription, "Union of the wetbacks."

█ The Board found that these discharges were motivated by anti-union animus. We believe that there is substantial evidence on the record to support this finding. The Company argues that the employees were fired pursuant to an established "no drinking" rule. It notes that Paniagua and Chavez had been warned about their drinking on September 22. The record clearly indicates that other employees were fired for violating the rule. However, the record also indicates that other employees found drinking on the job (including Chavez and Paniagua, as evidenced by the fact that they were warned but retained in September) were not discharged. Further, Mrs. Ramirez initially told Messrs. Chavez and Paniagua that they would be suspended for three days. Only after their conversations with Mrs. de la Torre—during which each admitted to Union involvement—were they actually fired.

Moreover, the actions were proximate in time to the beginning of the organizing drive. In fact, the discharges occurred one day after Mrs. de la Torre received the Union's telegram indicating the commencement of the organizing drive. That very day, Mr. Paniagua was observed signing a union authorization card. Also on that day, Mrs. Ramirez called a meeting to promise a raise if the employees would forget about the Union. Additionally, both men testified that Mrs. de la Torre told them that they would be fired if they were pro-Union but that they could keep their jobs if they were not. It is clear that the

Board's findings comprise a prima facie showing of discriminatory motive by the Company in discharging Mr. Chavez and Mr. Paniagua. It is equally clear that the Company's proffered legitimate reason—enforcement of the "no drinking rule"—was not proven before the ALJ by a preponderance of the evidence. We find that there is substantial evidence to support the Board's conclusion that the discharges of Paniagua and Chavez violated sections 8(a)(3) and 8(a)(1).

The Board's finding that employee Enelida Diaz was discriminatorily discharged is also supported by substantial evidence. Ms. Diaz was fired on October 18. The record shows that, on that day, she went to the lunchroom for her break. When she pushed some boxes of tostadas to make room to sit down, one fell to the floor and broke. Two male employees immediately began to clear the breakage. Supervisor Ramirez criticized Ms. Diaz for not helping, and Ms. Diaz replied that her help was unnecessary because the men had already taken care of the breakage. Later that day, Ms. Diaz offered to pay for the tostadas, but Mrs. Ramirez refused the offer. Mrs. Ramirez asked Ms. Diaz to remain after her shift to speak to Mrs. de la Torre. Ms. Diaz' shift ended at 4:00 a.m., and Mrs. de la Torre usually arrived between 6:00 and 6:30 a.m. Ms. Diaz told Mrs. Ramirez that she could not wait and left at her regular time. At about 9:00 or 10:00 a.m., Mrs. Carreon telephoned Ms. Diaz and informed her that she was fired. At first, Mrs. Carreon told Ms. Diaz that she was discharged for breaking the merchandise. Later in the conversation, however, she admitted that the dismissal was because of the Union.

As in the cases of Messrs. Chavez and Paniagua, we find substantial evidence to support the Board's finding that Ms. Diaz was discharged because of her Union activities. Ms. Diaz was an active union supporter; she attended several meetings and distributed cards to her fellow employees. She was mentioned as a member of the Union's organizing committee in Mr. Loza-

no's October 13 telegram to Mrs. de la Torre. These factors substantially support a finding that Ms. Diaz was a discriminatee.

The ALJ had ample grounds for rejecting the Company's position that it fired Ms. Diaz for insubordination or for breaking the tostados. The Company had never before nor after fired someone for breaking tostadas. Moreover, Ms. Diaz volunteered to pay for the damage. Thus, the breakage argument is clearly pretextual. The Board's finding that Ms. Diaz' discharge violated section 8(a)(3) is supported by substantial evidence on the record.

### CONCLUSION

Because we find that the Board's determinations that the Company was guilty of various violations of sections 8(a)(3) and 8(a)(1) are supported by substantial evidence on the record taken as a whole, we enforce the Board's order.

ENFORCED.