**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, LOCAL UNION NO. 644, Respondent.**

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, AFL–CIO, LOCAL UNION NO. 644, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 86–1684, 86–1752.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1986.

Decided Jan. 23, 1987.

As Amended March 5, 1987.

Frederick Havard, N.L.R.B., Elliott Moore, N.L.R.B., Washington, D.C., for petitioner.

Fred A. Ricks, Jr., Wiley, Craig, Armbruster & Wilburn, St. Louis, Mo., for respondent.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

This action is before us on the application of the National Labor Relations Board ("the Board") to enforce its order finding that Local 644 of the Laborers' International Union of North America ("the Union") had engaged in unfair labor practices in violation of §§ 8(b)(1)(A) and (2) of the National Labor Relations Act ("the Act"). The Union has cross-applied for review and asks us to set aside the Board's order. For the reasons set forth below, we enforce the Board's order.

## I.

Kellerman Brothers Construction Company ("the Company") is a member of the Southern Illinois Builders Association ("SIBA") which negotiates collective bargaining agreements on behalf of its members. The Company has never assigned its bargaining rights to SIBA, but it has always signed the bargaining agreements negotiated by SIBA and the Union on an individual basis. These agreements provide for the Union's operation of an exclusive hiring hall through which employers are to hire their employees. Both Union members and non-members alike have the right to register with the Union and sign a referral list. The Union then refers out employees in the order of their signing the list without regard to Union membership. Employers who are signatories to the bargaining agreement may request the referral of a limited number of specific employees, "key men," regardless of their position on the list.

In August 1984, the Company requested that the Union refer Jack Jones, a Union member, to replace an employee who had left the Company. The Union agreed to refer Jones as a "key man," even though Jones was not at the head of the referral list. Jones, however, refused the referral, and the Company sought to hire Joseph Baker, a non-member of the Union.

In early September Company president Albert Kellerman and Baker visited the Union's business manager, Donald Moore, at the Union's business office. Kellerman informed Moore that he wanted to employ Baker and asked him to accept Baker's payment of an initiation fee for union membership, allow Baker to register with the Union and sign the referral list, and then refer Baker to work for the Company as a "key man." According to the testimony of Kellerman and Baker, Moore refused Kellerman's request, claiming that there were too many out of work Union members already on the referral list. Moore later added that he might accept Baker's initiation fee if Baker were not employed on the Holts Prairie Baptist Church site. As this was the Company's only major construction project, Kellerman rejected the offer.

Following the September meeting, Moore attempted to locate a copy of the Company's executed collective bargaining agreement. Although he testified that he was certain that the Company had executed an agreement, Moore was unable to find the signed copy in the Union's files. He proceeded to deliver unsigned copies of the bargaining agreement and the participation agreement, which provided for the deduction of benefit payments for employees, to Richard Pressman, a union steward working for the Company. Moore instructed Pressman to have Kellerman sign the documents on behalf of the Company. Kellerman signed the participation agreement, but refused to sign the bargaining agreement until the Union accepted Baker into its membership. Moore thereupon informed Kellerman that the Union would picket the Company's jobsites if Baker went to work for the Company.

On September 24, 1984, Baker began working at the Church construction site. The Union established picket lines at each of the Company's jobsites with signs stating that the Company was not a signatory to the bargaining agreement.

On September 27, 1984, Moore sent Kellerman a letter, enclosing a memo which had been signed by the Union's executive board. The memo read:

> Al Kellerman signed participation agreement but will not sign contract until Labor Local 644 takes Joe Baker into local 644. All executive board members present vote to keep pickets up on Al Kellerman, and not let Joe Baker into labor local 644.

Moore concluded the letter by saying, "Let's forget Baker, you sign and we will build the Church."

Kellerman met with Moore at the Company's U.S. Gypsum worksite on October 3, 1984. Kellerman told Moore that he was willing to sign the bargaining agreement, but that he would not lay off Baker. Kellerman then handed Moore a signed copy of

the bargaining agreement. Moore responded by telling Kellerman to "[g]et Joe Baker out of there and we will go back to work." Kellerman took Baker off the site and the picketing ceased. The next day Kellerman drove Baker to the Church site where he needed another laborer. Union steward Pressman, who was working at the site, informed Kellerman that if Moore saw Union laborers working with Baker, he would "jerk them off the job and put up a picket line." Kellerman therefore removed Baker from the jobsite. When Moore later arrived at the site, Pat Kellerman, Albert's son who was also a carpenter working on the site, overheard Moore tell two laborers that he was not going to sell Baker a Union card and that if Albert Kellerman brought Baker back to the site, they should hit him on the head with a two-by-four.

On October 5, 1984, Baker met with Moore in a final attempt to join the Union or at least to sign the referral list so that he could be assigned to work for the Company. Moore again refused and told Baker that he could let whomever he wanted into the Union and there was no way he was going to sell Baker a card. Moore further replied that there were already fifty names on the referral list. When Baker questioned him about his selling a card to another person in August, Moore explained that he had sold a card to an American Indian to keep blacks out of the area.

Baker filed a charge of unfair labor practices against the Union on October 9, 1984. After a hearing in July 1985, before an Administrative Law Judge, the Board issued its decision adopting the order and opinion of the Administrative Law Judge. The Board found that the Union had violated § 8(b)(1)(A) of the Act by picketing the Company's jobsites in an attempt to force the Company to hire only Union members while denying Union membership to Baker, by threatening the Company with picketing if it employed Baker, and by telling other Company employees that the Union was denying membership status to Baker and threatening violence if Baker was employed at Company jobsites. The Board also found that the Union had violated § 8(b)(2) by causing the Company to discharge Baker through its threats to picket and its picketing of Company jobsites, by conditioning the termination of its picketing on the discharge of Baker, by telling Company employees that Baker's non-membership in the Union was the reason for its attempt to stop him from working for the Company while at the same time denying him membership, and finally by threatening unspecified reprisals.

The Board's order requires the Union to cease and desist from the unfair labor practices found and from restraining or coercing employees in the exercise of their § 7 rights "in any like or related manner." The order also requires that the Union reimburse Baker for any loss of earnings or other benefits that resulted from the Union's unlawful conduct. Finally the order requires the Union to notify the Company that the Union no longer objects to the Company's employing Baker and to remove from its files any reference to Baker's unlawful discharge.

## II.

The sole issue on appeal is whether the Board's factual finding that the Union violated §§ 8(b)(1)(A) and (2) of the Act is supported by substantial evidence in the record as a whole. Our review of Board orders is limited to seeing that this standard has been satisfied. See *NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1121 (7th Cir.1986); *International Union of Operating Engineers v. NLRB*, 755 F.2d 78, 81 (7th Cir.1985); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed 456. Moreover, it has long been well settled in this Circuit that a reviewing court "must accept the Board's credibility findings unless the party challenging the credibility determinations establishes 'exceptional circumstances.'" *Del Rey Tortilleria*, 787 F.2d at 1121 (quoting *NLRB v. Harrison Steel Castings Co.*, 728 F.2d 831, 836 n. 9 (7th Cir.1984)); see *NLRB v. Berger Transfer & Storage Co.*, 678 F.2d 679, 687 (7th Cir.1982); *Medline*

*Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir.1979); *Electri-Flex Co. v. NLRB*, 570 F.2d 1327, 1331–1332 (7th Cir. 1978), certiorari denied, 439 U.S. 911, 99 S.Ct. 280, 58 L.Ed.2d 256.

The Board's essential finding was that the Union had engaged in conduct designed to cause the discharge of Baker because he was not a Union member. The Union contends that its actions in causing Baker's discharge were motivated by lawful considerations. First the Union contends that it lawfully demanded that the Company refuse to employ Baker because his employment was in breach of valid and contractually mandated referral hall rules. Second the Union argues that it picketed the Company solely to compel the Company to sign a copy of the bargaining agreement, not to compel the discharge of Baker. The Union's position is that these lawful justifications were summarily rejected by the Board, contrary to the substantial weight of the evidence.

▮ The Union has unnecessarily complicated our review in this case by mischaracterizing the nature of the evidence upon which the Board relied in concluding that the Union violated §§ 8(b)(1)(A) and (2). Section 8(b)(2) makes it an unfair labor practice for a union to cause or attempt to cause an employer to discriminate against an employee in regard to hire, tenure, or any terms or conditions of employment for the purpose of encouraging or discouraging membership in any labor organization. Section 8(b)(1)(A) makes it an unfair labor practice for a union to restrain or coerce employees in their rights to organize or to refrain from organization. While a violation of either of these Sections is premised upon a finding of discriminatory intent, direct evidence of a specific intent to encourage or discourage union membership

through discrimination is not always necessary. *Radio Officers' Union v. NLRB*, 347 U.S. 17, 44–45, 74 S.Ct. 323, 337–338, 98 L.Ed. 455, *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308.

In certain circumstances, discriminatory intent may be inferred from circumstantial evidence of conduct. Conduct "inherently destructive of employee interests" carries with it a strong inference of impermissible motive. In such a situation, even if the union comes forward with a nondiscriminatory explanation for its actions, the Board may still draw an inference of improper motive from the conduct itself and "exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 701, 103 S.Ct. 1467, 1473, 75 L.Ed.2d 387 (quoting *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027). Where, however, the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," direct proof of specific intent is necessary to sustain the violation if the union comes forward with evidence of "legitimate and substantial business justifications for the conduct." *Id.*

The Tenth Circuit has recently analyzed the Board's use of the presumption of illegal motive in cases involving alleged violations of § 8(b)(2).[1] In *Glaziers Local Union 558 v. NLRB*, 787 F.2d 1406 (10th Cir.1986), the court invalidated the Board's blanket use of the presumption that a union acts illegally any time it prevents an employee's hire or causes an employee's discharge to find a violation of § 8(b)(2). It then went on to hold that the presumption

---

**1.** The Supreme Court cases delineating the proper use of the presumption of illegal motive have all involved alleged violations of § 8(a)(3) of the Act which makes it an unfair labor practice for an employer to discriminate against an employee in regard to hire, tenure, or terms or conditions of employment for the purpose of encouraging or discouraging membership in a labor organization. The Tenth Circuit in the *Glaziers*

case found the enunciated principles equally applicable to determinations of intent in cases involving alleged violations of § 8(b)(2). 787 F.2d 1406, 1413 n. 9 (1986). By the very terms of the statute, to establish a violation of § 8(b)(2), the Board must find that the union caused or attempted to cause an employer to discriminate against an employee in violation of § 8(a)(3).

is properly applied only when supported by substantial evidence in the record demonstrating that the union's conduct was "inherently destructive of employee rights." *Id.* at 1414. As a consequence, it refused to enforce the Board's order because the union had offered a legitimate business justification for its conduct and there was no direct proof that the union was motivated by a discriminatory purpose.

The Union somehow contends that the *Glaziers* result is controlling in the instant case. According to the Union, the Board simply refused to consider any of the legitimate business motivations which were offered to justify the Union's conduct. As a result, the Union maintains, the Board failed to strike the proper balance, as required by the Supreme Court, between the Union's "asserted business justifications and the invasion of employee rights." The Union concludes that the Board's determination of unlawful intent rests on an erroneous legal foundation and must therefore be set aside.

■ We cannot agree with the Union's analysis here because it is based on a serious mischaracterization of the type of evidence underlying the Board's determination of discriminatory intent. Although it is true that the Administrative Law Judge mentioned the *Glaziers* presumption of illegality in his opinion, it is clear that he did not rely on the presumption in reaching the conclusion that the Union had violated §§ 8(b)(1)(A) and (2). Rather he, and by adoption the Board, made a specific finding that the Union's intent was "to preclude Baker from employment while the Union's members were unemployed" on the basis of direct evidence of specific intent presented by Baker and the Company. In contrast, in the *Glaziers* case, the Administrative Law Judge found that the union's actions were motivated by its desire to protect the traditional apprenticeship system. 787 F.2d at 1411. When direct evidence of a subjective intent to discriminate or to encourage or discourage union membership is presented, the balancing of competing interests mandated by the Supreme Court in cases where intent is inferred from circumstantial evidence of conduct does not come into play. As the Supreme Court has explained:

> [Direct proof of specific intent] itself is normally sufficient to destroy the … claim of a legitimate business purpose, if one is made, and provides strong support to a finding that there is interference with union rights or that union membership will be [encouraged or] discouraged. Conduct which on its face appears to serve legitimate business ends in these cases is wholly impeached by a showing of an intent to encroach upon protected rights.

*NLRB v. Erie Resistor Corp.*, 373 U.S. at 227–228, 83 S.Ct. at 1144–1145.

■ Although the presence of direct proof of specific intent makes the *Glaziers* case inapplicable here, we also disagree with the Union's characterization of the Board's treatment of the nondiscriminatory justifications offered by the Union for its actions in causing Baker's discharge. The Union suggests that these justifications were summarily rejected by the Board. The opinion of the Administrative Law Judge adopted by the Board reveals to the contrary that the evidence and testimony presented by the parties were carefully weighed and considered, but that ultimately the testimony of Baker and of Albert and Pat Kellerman was credited over that of Moore and the other Union members. As a result, the Board concluded that the Union's proferred justifications were pretextual and not the type of "legitimate and substantial business justifications" contemplated by the Supreme Court. In reviewing the Board's order, we are bound by that credibility finding unless the Union raises "exceptional circumstances" for challenging it.

The Union does not, and indeed cannot, contest that the Board's factual findings as a matter of law support the Board's conclusion that the Union violated §§ 8(b)(1)(A) and (2) of the Act. *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 676–677, 81 S.Ct. 835, 840, 6 L.Ed.2d 11, (hiring hall arrange-

ments are unlawful if they in fact result in discrimination prohibited by the Act); *NLRB v. International Brotherhood of Electrical Workers, Local 575,* 773 F.2d 746, 749–750 (6th Cir.1985) (union violates §§ 8(b)(1)(A) and (2) if its exclusive hiring hall refuses to place non-members on the referral list or gives members preference over non-members in referrals); *NLRB v. International Brotherhood of Electrical Workers, Local 11,* 772 F.2d 571, 575–576 (9th Cir.1985) (union's invidious and arbitrary use of hiring hall violated §§ 8(b)(1)(A) and (2)); *Lewis v. Local Union No. 100 of the Laborers' International Union,* 750 F.2d 1368, 1372 n. 5 (7th Cir. 1984) (union's failure to refer employee to prospective employers in accordance with collective bargaining agreement violates §§ 8(b)(1)(A) and (2)); *NLRB v. Local 90, Operative Plasterers and Cement Masons' International Association,* 606 F.2d 189, 191 (7th Cir.1979) (discrimination against employee in the operation of a referral system by refusing to refer and failing to include employee on hiring list constitutes coercive conduct within the meaning of § 8(b)(1)(A)). With the issue properly framed, we now proceed to determine whether there is substantial evidence in the record as a whole to support the Board's finding that the Union's conduct was designed to cause Baker's discharge because he was not a Union member, and its rejection of the purportedly "lawful" motivations offered by the Union.

### A.

The Union initially contends that it sought Baker's discharge because he had never signed the referral register and because Baker could not qualify as a "key man" under the terms of the bargaining agreement. The Union therefore maintains that it was lawfully enforcing the contractual hiring hall system when it refused to refer Baker to the Company and later requested his discharge after the Company had hired him in violation of the referral clause.

The Union's argument centers on the testimony of Union manager Moore that he had on numerous occasions explained the membership application and referral procedures to both Kellerman and Baker and had specifically told Baker how to sign the referral list, but that Baker had never registered for referral by the Union. The Administrative Law Judge expressly chose not to credit Moore's testimony in this regard. Instead, he credited the testimony of Kellerman and Baker that Moore had refused to allow Baker either to sign the referral list or to join the Union because there were too many laid-off members on the referral list. Baker testified that he had approached Moore in September and October of 1984, and that on both occasions he had been denied access to the referral register. Furthermore, the memo of the Union's executive board sent to Kellerman on September 27, 1984, stated that the members had voted "to keep pickets up on Al Kellerman, and not let Joe Baker into labor local 644." Finally, Pat Kellerman testified that he heard Moore tell two Union laborers on October 4, 1984, that he was not going to sell Baker a Union card. The Union has raised no exceptional circumstances that would warrant our challenging the credibility determinations of the Administrative Law Judge and adopted by the Board.

The Union also argues that Baker did not qualify as a "key man" under the terms of the collective bargaining agreement and thus was not eligible to bypass the referral procedures. Article 3, Section 2 of the agreement entitled "Referral Clause" sets out the procedures for referrals to employers who are signatory to the labor agreement. These employers are entitled to request two "key men" on any project or job without regard to their position on the referral list. Attached to the bargaining agreement is an addendum contract entitled "Addendum and Agreement for Non-Association Contractors." The addendum contract does not contain a "key man" provision. The Union contends that the Company was a non-association contractor and thus was not a signatory to the agreement.

Consequently, it was bound by the addendum contract and was not entitled to "key men."

It is undisputed that the Company was a member of the Southern Illinois Builders Association. Although the Company had never assigned its bargaining rights to SIBA, it had always signed the collective bargaining agreements negotiated by SIBA and the Union on an individual basis. The Administrative Law Judge and the Board made a specific factual finding that Kellerman had signed the then current 1982–1985 labor agreement on behalf of the Company. Interpreting the bargaining agreement so as to give the language its plain meaning, the Administrative Law Judge and the Board concluded that the Company was covered by the principal agreement and not by the addendum contract.

■ We agree with the Board's construction of the bargaining agreement. By the terms of the agreement, an employer must satisfy two requirements in order to qualify for the "key man" exception to the referral system in Article 3, Section 2. First he must be a signatory to the agreement and second he must be an Association Contractor. Kellerman and the Company met both of these requirements. The Union asks us to read into Section 2 a further requirement for an employer to take advantage of the "key man" provision, namely, that the employer must have delegated its bargaining rights to a multi-employer association and be signatory to the contract through the association. We refuse to imply such a requirement when there is no indication in the plain language of the agreement that it was intended. Furthermore, the addendum contract by its very terms applies only to "Non-Association Contractors." The plain language of the addendum nowhere suggests that it was intended to apply to Association Contractors who signed the agreement on an individual basis.

The Board's construction of the contract is further supported by the Union's treatment of Kellerman's request in August 1984, that the Union refer Jack Jones, a Union member, to replace an employee who had left the Company. The Union does not dispute that Moore agreed to refer Jones to the Company even though Jones was not at the head of the referral list at the time of Kellerman's request. Instead it merely argues that past practice should not be used to modify its interpretation of the language of the agreement that the Company was covered by the addendum contract as a Non-Association Contractor.

The Union also argues that even if Article 3, Section 2 of the agreement were applicable to the Company, the Company violated the provision in that section which states: "The Employer shall not recruit or hire applicants directly." Because the Company hired Baker directly, the Union maintains that it could lawfully seek his discharge. The Administrative Law Judge and the Board found, however, that Kellerman and Baker went to see Moore in early September 1984, prior to Kellerman's hiring Baker. Kellerman asked Moore to accept Baker's payment of the initiation fee for union membership and to refer Baker to work for the Company. Moore refused to allow Baker either to join the Union or to sign the referral list. Kellerman again contacted Moore on September 22, 1984, and asked him to change his mind about Baker, but Moore again refused to allow Baker to work for the Company. It was only after these two refusals by Moore of access to the referral list that Kellerman was forced to hire Baker directly.

There was clearly substantial evidence in the record for the Board to reject the Union's contention that it was merely enforcing the exclusive hiring hall provision of the labor agreement and to conclude instead that "Moore, in his dedication to serve the membership of the Union ... sought to and did block Baker's membership in the Union and employment by Kellerman solely because of Baker's nonmembership in the Union." Unlike the *Glaziers* case where the union's intent to discriminate was only inferred from other evidence of conduct, the Board in this case was presented with ample proof that the true

intent motivating the Union's conduct resulting in Baker's discharge was a desire to discriminate in favor of Union members and against Baker, a non-member.

### B.

The Union's second principal argument is that it had a right to picket the Company's jobsites because the Company had refused to sign the collective bargaining agreement. As a result, the Union maintains that the Board erred in finding that the Union's picketing was intended to compel the Company to discharge Baker rather than to sign the bargaining agreement.

The Administrative Law Judge found that Kellerman had signed the 1982–1985 collective bargaining agreement shortly after it had been negotiated by SIBA and the Union. In September 1984, after the dispute between the Union and the Company had begun, Moore searched his files for a copy of the Company's signed agreement, but was unable to locate it. Moore therefore decided to have Kellerman sign another copy of the agreement, but Kellerman refused to do so until Moore allowed Baker to sign the referral list. The findings of the Administrative Law Judge indicate that the Union knew that Kellerman had originally signed the agreement and it never contended that the Company was not bound by its terms. Indeed Moore testified that he subsequently found the signed copy in his file cabinet. Thus, at most, the Union's defense is that it was picketing the Company in order to force Kellerman to sign an additional copy of the agreement to replace the one lost in Moore's files.

After considering the testimony of Moore, Kellerman, and Baker, the Administrative Law Judge, and by adoption the Board, rejected the Union's contention that it was merely picketing to force the Company to sign the agreement. Instead, they concluded that the Union was picketing primarily to secure Baker's discharge by the

Company. This conclusion is supported by substantial evidence in the record. Kellerman testified that on September 22, 1984, Moore told him that the Union would picket the Company's jobsites if Baker went to work for the Company. Moore's September 27, 1984, letter to Kellerman, enclosing the executive board memo, similarly indicated that the Union would take down its picket lines if the Company discharged Baker. On October 3, 1984, Kellerman delivered a signed copy of the bargaining agreement to Moore, but Moore refused to call off the picketing until Kellerman removed Baker from the worksite. Finally, on October 4, 1984, after Kellerman had signed the agreement, Pressman, the union steward, informed Kellerman that Moore would put the picket lines back up if he saw Baker working at any of the Company's jobsites.

Based on the above evidence, the Board was more than justified in concluding that compelling Kellerman to sign a replacement copy of the bargaining agreement had little, if anything, to do with the Union's picketing. The primary condition set by the Union for the discontinuance of its picketing was the Company's discharge of Baker. The Board therefore properly concluded that the picketing was "spearheaded by the Union's intent to preclude Baker from employment while the Union's members were unemployed."

### III.

There is substantial evidence in the record as a whole to support the Board's findings that the Union denied Baker access to the referral hall, threatened to picket and did picket the Company until Baker was discharged, and instructed other employees to use violence against Baker if the Company attempted to put him to work, all because Baker was not a member of the Union.[2] The Board's order is therefore enforced.

---

**2.** The Union also argues that there was insufficient evidence in the record to support the Board's finding that the Union had engaged in threats of violence. In particular, the Union

challenges the credibility of Pat Kellerman's testimony that he overheard Moore tell two laborers that if Baker returned to the worksite, they should hit him over the head with a two-by-four.

The Union has failed to establish any exceptional circumstances that would warrant our questioning the Board's credibility determination in

this instance. *NLRB v. Del Rey Tortilleria, Inc.,* 787 F.2d 1118, 1121 (7th Cir.1986).